BREEZE v. MACKINNON MANUFACTURING CO.

1. MASTER AND SERVANT—INJURIES TO SERVANT—UNSAFE PLACE
   TO WORK—ASSUMPTION OF RISK.
   A servant working on a boiler which lay on a railroad switch
   track in the master's yard, where switching was done daily,
   assumed the risk of being injured by a train. MOORE, C. J.,
   and OSTRANDER, J., dissenting.

2. SAME—INDEPENDENT CONTRACTORS—LIABILITY.
   A manufacturer, through whose works a railroad switch track
   is built, is not responsible for injuries to his servants arising
   from the negligence of the railway operatives in switching
   cars thereon, he having no control over their operations.
   MOORE, C. J., and OSTRANDER, J., dissenting.

3. RAILROADS—INJURY TO PERSON ON TRACK—NEGLIGENCE—CON-
   TRIBUTORY NEGLIGENCE—QUESTION FOR JURY.
   Where a laborer working in a mill yard was killed by being
   pinched by the cars of a railroad company engaged in switch-
   ing in the yard, evidence in a suit to recover for his death
   examined, and held, that the questions of the negligence of the
   railroad operatives and of the contributory negligence of de-
   ceased were for the jury. GRANT, J., dissenting.

Error to Bay; Shepard, J. Submitted January 5, 1905.
(Docket No. 17.) Decided June 8, 1905.

Case by Martha Breeze, administratrix of the estate of
William Breeze, deceased, against the MacKinnon Manu-
facturing Company and the Michigan Central Railroad
Company for the negligent killing of plaintiff's intestate.
There was judgment for plaintiff, and defendants bring
error. Reversed as to defendant manufacturing com-
pany and affirmed as to defendant railroad company.

*Simonson, Gillett & Clark*, for appellant MacKinnon
Manufacturing Co.

*E. A. Cooley* (*O. E. Butterfield*, of counsel), for appellant railroad company.

*Edward E. Anneke* (*M. L. Courtright*, of counsel), for appellee.

HOOKER, J.   The defendant MacKinnon Manufacturing Company set plaintiff's husband at work upon a boiler which lay across the end of a railroad switch in its yard, upon which switching was done daily.   It was obvious to the plaintiff's intestate that there was danger from the backing in of cars, and he talked to his co-laborer about it. He knew of and understood the danger as well as the defendants did, and chose to accept the situation.   Under such circumstances the employer cannot be held liable upon the ground merely of a failure to furnish a safe place to work.   The case is within the rule of *Middaugh* v. *Mitchell*, 120 Mich. 581.   It is not reasonable to suppose that the parties contemplated that the employer would change the usual habit of business in the yard, or that the employer would, either personally or through agents employed for the purpose, keep watch of the trains, and give warning to the plaintiff of their approach.   Such a claim is so at variance with the common experience as to make it untenable.   There is no proof in the case from which it can be inferred.   Again, at the time he was hurt the plaintiff's intestate was not at work upon the boiler, but was passing between it and a car three or four feet away.   Being struck by a switch train, this car struck him down, just as it would have done, had not the boiler been there, or had he not intended to resume work upon it.

It is said that the MacKinnon Bros. are responsible for the negligence of the railroad company.   This is upon the ground that they were its agents, because switching cars in its yard.   This claim cannot be sustained.   The MacKinnon Company had no supervision or control of the railroad company or its men.   The company was an independent contractor, responsible for its own negligence. 1 Thompson on Negligence, §§ 621, 646.

We see no escape from the conclusion that the MacKinnon Company is not justly chargeable with any fault, unless it be that the work should not have been done upon the track, and of that the intestate was aware as well as it, and, by not declining to do it there, he accepted the situation and the danger. A verdict of not guilty should have been directed as to the MacKinnon Company.

With the railroad company the question is different. There is testimony in the case tending to show that the trainmen knew that this work was going on, and that they gave no signal of the approach of the train, and used no care to prevent the collision between the stationary car and the boiler. There was therefore a question of fact as to their negligence. There was no assumption of risk of the railroad's negligence as between plaintiff and the railroad company, as there was between him and his employers. The question of contributory negligence is one which was for the jury. There was proof from which it might have been found, but it was not conclusively shown, for the situation was one which was not free from dispute, and minds might well differ as to the degree of care which it demanded.

The judgment should be reversed as to the MacKinnon Company, and affirmed against the railroad company.

CARPENTER, MCALVAY, BLAIR, and MONTGOMERY, JJ., concurred.

MOORE, C. J. From a judgment in favor of plaintiff, each of the defendants has appealed. Each states that the only error relied upon is the failure of the judge to direct a verdict in its favor. Counsel for the railroad company say in their brief:

"Under all the circumstances, if judgment cannot be entered for defendant the Michigan Central Railroad Company, or both defendants, we ask that the judgment of the lower court be affirmed, as we do not wish a reversal and another trial in the circuit court."

Counsel for the other defendant take the same position in relation to that company.

William Breeze was in the employ of the MacKinnon Manufacturing Company, who are machinists and boiler makers; having a large plant on Water street, in Bay City. Defendant railroad company has a track on this street, which runs north and south, and a spur about 100 feet long extends from this track south upon the property of the MacKinnon Company, and, after making the connecting curve, runs almost parallel with the track on Water street. This spur is used by the MacKinnon Company exclusively in its business. This spur runs between the main track and the buildings of the MacKinnon Company. In the latter part of April, 1903, the MacKinnon Company received an old boiler to be cut up for scrap, and unloaded it lengthwise on this spur track, and about 15 feet north from the bumping post. The deceased was on May 5th set at work cutting upon this boiler, and worked a few hours on six different days; working a total of 20½ hours prior to May 14th. On that day he had worked 3 hours, and, just before the accident in which he received injuries which resulted in his death, went to the office building to get some wedges, where he was directed to go for them. On the day previous a flat car was delivered on this spur to the MacKinnon Company, and was loaded with a large new boiler, 6 feet high and 20 feet long. Deceased helped to load it. In the forenoon of the day of the accident the railroad company delivered upon this spur a car loaded with scrap iron and two old boilers. This spur passed over the sidewalk, and, to leave it clear when the second car was brought in, the car upon which the new boiler was loaded was pushed farther down the spur, and to within a few feet of where the old boiler was.

Counsel for plaintiff state the situation as follows:

" This spur was then occupied as follows: First, by the old boiler, eighteen feet long, lying lengthwise of the track, about fifteen feet from the bumping post; next, the car on which the new boiler had been loaded; and, next, the

flat car loaded with scrap iron and two old boilers. With the cars in this position, an engine of the defendant railroad company backed onto this spur track, about 3:05 in the afternoon of May 14th, for the purpose of taking out the car on which the new boiler was loaded.

"In the meantime the deceased had come out of the boiler shop with the wedges, and walked down on the east side of the spur track at the side of these cars to the old boiler. He stepped in between it and the cars just as the engine was coupling onto them to pull them out.

"The cars were struck with such force that they were driven against the front or north end of the old boiler, and deceased was caught between it and the end of the car and crushed, from which injuries he subsequently died."

It is their claim that deceased was not notified by either of the defendants of the coming of this engine, and that the proper and usual signals of its coming were not given. Both defendants claim that a verdict should have been directed in favor of both of them, *first*, on the ground of contributory negligence; and, *second*, because the accident which caused the death of Mr. Breeze was among the assumed risks of his employment.

If it is true, as claimed by plaintiff, that it was only occasionally that an engine was run upon this track, and then only when directed by the MacKinnon Company, and if it is also true that this was done upon this occasion without giving any warning of the approach of the engine, then we cannot say, as a matter of law, that the doctrine of contributory negligence or that of assumed risk made a defense. As to both of these defenses a question of fact existed, which was for the jury. See 4 Thompson on Negligence, §§ 4647, 4648; *Swoboda* v. *Ward*, 40 Mich. 420.

Three other defenses are urged upon the part of the railroad company:

*First.* That there was no common duty between the railroad company and the MacKinnon Company; that, while the latter might be under obligations to furnish its employés with a safe place to work, as the deceased was

not an employé of the railroad company, nor employed upon its premises, it was under no duty to provide him a safe place to work.

*Second.* It is said that the servants of the railroad company in charge of the train were for the time being the servants of the MacKinnon Company, and therefore the fellow-servants of Mr. Breeze, and even if the negligent acts of the trainmen caused the death of deceased, the plaintiff cannot recover.

*Third.* That the relation of the railroad company to Breeze was not the same as its relation to the general public, but was similar to its duties to its own employés, and that no such negligence on the part of the railroad company has been shown as would make it liable.

In relation to the defenses urged on the part of the railroad peculiar to itself, the MacKinnon Company replies that the railroad company at no time during the trial urged immunity on its behalf, in the absence of similar immunity for the MacKinnon Company. It also insists that if there was no common duty, and therefore no joint liability, it, and not the railroad company, is the one in whose favor a verdict should be directed. The MacKinnon Company also insists that what it did or failed to do was not the proximate cause of the injury, but the running of the engine at the particular time, and the making the coupling in the particular way it was made, was the proximate cause.

It would profit no one to discuss these various defenses in detail. We have examined them with great care in connection with the testimony, which was in many respects contradictory. We must content ourselves with saying that, as a result of this examination, we are satisfied that we cannot enter a judgment in this court for either of the defendants.

Judgment should be affirmed.

OSTRANDER, J., concurred.

GRANT, J. (*dissenting*).     Upon spur tracks running from the defendant railroad company's main track to the plant of the defendant MacKinnon Manufacturing Company, and to the plant of the Industrial Works, cars are daily being switched in and out.     Some three weeks prior to the accident the MacKinnon Manufacturing Company had unloaded a marine boiler lengthwise on its spur track, the south end of the boiler being a short distance from the bumper.     The reason given for placing it on the track is lack of room in its yards.     A new boiler had been loaded upon a flat car a day before the accident, ready for shipment, and the defendant manufacturing company had ordered the railroad company to take it out that day. Meanwhile, on the morning of the day of the accident, a flat car had been placed directly in front of this car, and was loaded with two old boilers and some scrap iron, which was to be unloaded at the manufacturing company's plant.     The witnesses do not agree as to the extent to which this boiler had been dismantled at the time of the accident.     It is undisputed that its top had been removed, so that the highest part left was the top of the fire box, between five and six feet from the ground.     Various employés had been at work for some time in cutting this boiler to pieces.     They did not work continuously, but only when there was not other more important work for them to do.     Mr. Breeze had been in the employ of the manufacturing company for almost a year, and had worked upon this boiler for six different days, ranging from a half hour to nine hours at a time each day.     Mr. Breeze and his helper, named Casper, were upon the day of the accident working on top of the boiler.     They had no occasion to be at either end of the boiler, except as they climbed up or came down from the work.     The south end of the car on which was the new boiler was from 3 to $3\frac{1}{2}$ feet from the end of the old boiler.     About 3 o'clock p. m. the engine of the defendant railroad company backed onto the spur of the MacKinnon Manufacturing Company to take out the two flat cars.     About seven or eight min-

utes before the accident Mr. Breeze left the old boiler and went to the boiler shop to get some wedges. He returned with them, and, evidently without looking or listening, stepped in between the bull nose or coupling of the car and the boiler, with his back towards the car and his face towards the boiler; intending to climb up to the top to continue his work. Just at that moment the engine and tender backed down to couple onto the two flat cars; the force being sufficient to drive the bull nose against the body of Mr. Breeze, striking his hips and crushing him so that he died a few hours afterwards.

The declaration alleges the duty of the MacKinnon Manufacturing Company to furnish a place reasonably safe and free from danger in which to work, and to place this old engine upon which Mr. Breeze was required to work in such a place that he could work on the same without danger of being struck or run into by the engines and cars of the railroad company; also the duty of the railroad company to keep its side track and switch free and unincumbered for the passage of engines and cars thereon, and not allow said boiler to be unloaded and remain on said side track on which Breeze was required to work. It then alleges the neglect in wrongfully, etc., unloading this boiler and placing it on this side track or switch. It further alleges that the defendant knew or should have known that said cars and engine would come together with such force that the cars would be driven against said boiler, and that any one working thereon would be liable to be severely injured, that the railroad company drove its engine against the cars so on said side track in a careless and negligent manner, and neglected to ascertain whether any one was working on said boiler before attempting to couple onto said cars, and neglected to place any planks or blocks under the wheels of the car next to said boiler, so as to prevent the car being driven against the boiler, and that both defendants neglected to give any signal or warning of the approach of said engine and cars.

As Mr. Breeze came out of the boiler shop, the engine, and tender attached, was either backing down upon the spur track, or was standing still upon it. In either event it was in plain sight. It was coming in for the sole purpose of taking out the two cars. The track as it crosses the side track to the plant of the manufacturing company curves slightly to the west. The engine was backing down while Mr. Breeze was walking on the east side of the track, and evidently made the coupling just as Mr. Breeze had placed himself in front of the bull nose.

At the close of the proofs both defendants requested the court to direct a verdict of no cause of action. This was refused, and the case submitted to the jury, who rendered a verdict against both defendants.

The plaintiff's brief is directed almost exclusively to the liability of the defendant the MacKinnon Manufacturing Company, and mainly upon the ground that that company, through its proper officers, knew the distance between the boiler and the car, and the danger when making a coupling; that the coupling was to be made that afternoon in accordance with its order; and that it should therefore have given warning to Mr. Breeze either that the coupling was liable to happen at any moment, or to have watched and given him notice when the coupling was actually to take place. To this it is replied on behalf of both defendants that Mr. Breeze was entirely familiar with the danger; that he knew the boiler was loaded for transportation (he having helped load it), and was liable to be taken out at any moment; that cars were constantly being moved in and out upon the track, and any warning would have related only to things which he knew as well as any one; that, knowing all these things and the danger, he entered upon the work without protest, and therefore assumed the risk. In this respect I concur in the opinion of my Brother HOOKER. The only risk to be assumed was the risk arising exactly from what happened. There was no danger from any other source than the backing of the engine to make a coupling.

Whether there is logic in holding that that risk was assumed by Mr. Breeze as to his employer, but not as to the railroad company, it is unnecessary, in my view of the case, to determine.   There is no evidence of negligence on the part of the railroad company in making the coupling.   There is no evidence of careless handling or too great speed.   The only negligence possibly chargeable to it, in my judgment, is the failure to ascertain that Mr. Breeze was between the boiler and the car before making the coupling, and to notify him.   The cars did not rebound any farther than is usual.   All, at all conversant with coupling cars, know that they must come together with considerable force, and that, in coupling, the stationary car or cars are necessarily driven back to a greater or less distance.   This is true even of passenger cars.   Very slight precaution on the part of Mr. Breeze, taking no perceptible time, would have disclosed to him that the engine was approaching.   If he did not see it as he came from the boiler shop, he could have seen it, had he turned around to look when opposite the first flat car, or, before entering between the car and the boiler, he could have, by stepping to the east a few feet, seen it, or he could have called to his helper, Casper, who was on the other side of the track, and at the back end, to ascertain if the engine was backing up.   Casper did call to him, but the call was nearly simultaneous with the coupling. That he knew of the danger is apparent from the testimony of plaintiff's principal witness, Casper, who testified:

"This morning that he [Breeze] was hurt they came in with that other flat car, with the scrap iron on, and as soon as they came in they pushed the car with the new boiler on up close to the old boiler.   This was on the day that Breeze and I were working on top of the old boiler, and Breeze said to me: 'Look out!   They may run into the old boiler and hurt us.'   He said: 'We must get out of the way, so we won't get hurt.'   'Look out!   That may run into the old boiler and hurt us.'   He spoke that to me, and I spoke to him.   I knew there was some danger of

them running into the old boiler. I knew there was nothing there between to prevent the car striking the old boiler. I knew there was nothing under the wheel. Breeze said we must get out of the way, so we would not get hurt."

It is the universal rule that when one is about to enter upon a railroad track, where he knows that trains or engines are liable to pass at any moment, it is his duty to look and listen. I think this rule applies with equal force to this case. Mr. Breeze knew that the engine might come any moment to couple to the two cars and pull them out. A heavy engine, weighing about 90 tons, and its tender, were approaching within 100 feet. It seems to me apparent that, had he listened, he could have heard. However that may be, a few steps would have placed him in position to see. It was unnecessary to climb upon the boiler at the north end. Some of plaintiff's witnesses admit that it was feasible to climb up at the south end, though somewhat more difficult. When the deceased and others commenced work upon the boiler, they took wooden horses and placed planks upon them for work upon the sides and near the top. Casper says that when they got through with work upon the sides they laid the horses aside, and that they were lying there the day of the accident. The record discloses that the defendant had many of these horses, and any workman was at liberty to get them when and for what work he chose; and there is no testimony that one was not available, or that they could not have had one by asking for it. Why did they not keep one at the side of the boiler? No reason is given. Furthermore, it is apparent that material could have been placed at the side of the boiler, upon which the workmen could step to the top. No one directed the workmen to climb upon the boiler in the way they did. The deceased and other employés went this way simply because it was more convenient. Where there are two or more ways of doing a thing, one of which is dangerous and the others are not, it is no excuse to take the most convenient way because the others are somewhat more difficult. To me

it seems clear that the deceased assumed all the risk of taking the hazardous and more convenient way.

I think the court should have directed a verdict for the railroad company for another reason. There is evidence showing that the trainmen, as they were moving to and fro on the main track and side tracks, saw workmen at work on top of this boiler. If there is any evidence that the trainmen saw or knew or had reason to know that the employés of the MacKinnon Manufacturing Company were entering upon this dangerous place to get up and down from the boiler, or for any other purpose, it has escaped my attention.

The court, in his instruction, said to the jury:

" He [Breeze] may possibly have assumed that, working as he was there on top of the boiler, the railroadmen, in doing their work, could see him there, and know his condition, and therefore would be bound to exercise care."

There was little, if any, danger in working upon the top of the boiler. It rested upon a solid foundation, and even if, in coupling, a car should be driven back so as to strike the boiler, the danger to those upon the top would be comparatively slight. If Mr. Breeze had been on top, there would have been no accident. Can it be inferred that the trainmen, because they saw one or two men at various times upon the top of the boiler, knew or should have known that Breeze and his fellow workmen had selected a positively dangerous way, instead of one entirely safe? Had not the trainmen the right to assume the contrary? How could they know but that there was a way of climbing up the east side of the boiler, which was entirely hidden from their view, and safe? Shall these trainmen and the defendant railroad company be charged with knowledge when there is no proof of knowledge?

The sole basis upon which the railroad company can be held liable is that it had either actual or constructive knowledge of the custom of those working upon the boiler to go in between it and the car in front, and in this dangerous place climb to their work. I find no evidence of

such knowledge upon the record. Distressing as this accident is, and as all such accidents are, I am unable to find any legal basis for sustaining the judgment.

For the above reasons, I think the judgment should be reversed as to both defendants, and no new trial ordered.